NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0244n.06

Case No. 12-4244

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 31, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BISWANATH HALDER, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| TERRY TIBALS, Warden, | ) | OHIO |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: **CLAY and DONALD, Circuit Judges; MAYS, District Judge.**[*]

**BERNICE B. DONALD, Circuit Judge.** An Ohio jury convicted Petitioner Biswanath Halder of multiple counts of murder and kidnapping, resulting in a sentence of life imprisonment without parole. Relying on facts recited by the Ohio courts, the District Court denied Halder's petition for a writ of habeas corpus under 28 U.S.C. § 2254. On appeal, Halder challenges the state courts' determinations that he was competent to stand trial and not entitled to represent himself as unreasonable under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). For the reasons identified below, we hold that they were not. We therefore AFFIRM the denial of Halder's petition for a writ of habeas corpus.

---

[*] The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

## I.

On May 9, 2003, Halder used a sledgehammer to break into the Peter B. Lewis building at Case Western Reserve University (CWRU) in Cleveland, Ohio, and went on a shooting rampage. Dressed in a flak jacket, an army helmet, and an athletic supporter, and carrying both a Tech 9 semi-automatic and a Berretta nine-millimeter handgun, Halder shot and killed the first person he encountered and fired indiscriminately at the occupants and police who later arrived. He then held a number of people hostage for approximately eight hours before surrendering to the Cleveland SWAT team.

### A.     Competency Challenge.

On May 29, 2003, the Cuyahoga County Grand Jury handed down a 338-count indictment against Halder that included charges for aggravated murder, felony murder, mass murder, attempted murder, kidnapping, aggravated burglary, terrorism, and unlawful possession of dangerous ordnance. Halder pleaded not guilty at his arraignment, and his lawyers challenged his competency to stand trial.

The trial court held the first of two competency hearings on February 23-24 and March 21-23, 2005. Three mental health experts submitted reports and testified regarding Halder's competency: Dr. James Eisenberg, Dr. Barbara Bergman, and Dr. John Fabian. Although Drs. Eisenberg and Fabian concluded that Halder was not competent to stand trial, Dr. Bergman determined that he was.

Dr. Eisenberg, who testified for the defense, had been a psychologist for twenty-seven years and a forensic psychologist for fifteen. He met with Halder on five separate occasions for a total of eleven hours. Dr. Eisenberg ultimately testified that Halder was not competent to stand

trial, but he provided two reports on Halder whose conclusions conflicted. In a report dated November 5, 2003, Dr. Eisenberg opined that Halder suffered from a personality disorder but was competent to stand trial. In a later report, dated May 24, 2004, he concluded that Halder manifested persecutory and grandiose symptoms and that Halder's delusional conspiracy beliefs "made it nearly impossible for him to meaningfully assist his counsel with his defense." Dr. Eisenberg arrived at the second conclusion without personally re-evaluating Halder, and his final meeting with Halder took place more than a year before his testimony at the competency hearing.

Dr. Bergman, who testified for the State, had been a psychologist for thirty-five years and a forensic psychologist for twenty-nine. She had completed over fifteen hundred competency evaluations. Like Dr. Eisenberg, Dr. Bergman met with Halder on five separate occasions; however, she spent a total of fourteen hours with Halder, and her last meeting with him took place two weeks before her testimony at the competency hearing. Dr. Bergman testified that although Halder suffered from a severe personality disorder, she found no evidence that he suffered from a major mental disorder. She also observed that Halder was capable of discussing in great detail the events leading up to the shootings, as well as the shootings themselves.

Regarding Halder's specific understanding of the legal proceedings against him, Dr. Bergman testified as follows:

> [Halder] understood the charges. He knows what he's charged with. He didn't particularly understand what the designation, "aggravated" meant with aggravated murder but he knows he's accused of killing someone. He knows the person's name. He knows why he's charged with attempted murder. He knows all the charges. He knows what the charges mean, what they allege.
>
> . . . .
>
> He told me what plea he wanted to enter and gave me a rationale for why he wanted to enter that plea.

. . . .

[H]e is capable of understanding the nature and significance of the charges[.]

Regarding Halder's ability to assist in his defense, Dr. Bergman stated the following:

> [Halder] is capable of understanding the adversarial nature of the prosecutorial
> process; he is capable of participating in a meaningful manner in the
> process, in the courtroom while it's going on and in my opinion, he is
> capable of consulting with his attorneys to develop a defense.

Dr. Fabian had been a practicing forensic psychologist for six years and held a law degree. The trial court contacted him to evaluate Halder because of Dr. Eisenstein's and Dr. Bergman's conflicting diagnoses. Dr. Fabian met with Halder on four separate occasions for a total of twelve hours.[1] He opined that Halder suffered from both delusional and personality disorders and concluded that Halder was incapable of rationally assisting his lawyers. Dr. Fabian also testified, however, that "the issue of [Halder's] competency is a close call," and he observed that "there is some room for debate among experts about whether [Halder] suffers from both a delusion and a personality disorder."

The trial court ruled that Halder had failed to prove by a preponderance of the evidence that he was incompetent to stand trial, finding that Dr. Eisenberg was the least credible of the three mental health experts, that Dr. Fabian was the least experienced of the three, and that Dr. Bergman was the most credible and most experienced. The court also observed that Halder had given both Drs. Bergman and Fabian "detailed information about his involvement in the shooting[s] on May 9, 2003." Consequently, the court concluded, "there [wa]s evidence that

---

[1] Although the state court of appeals stated that Dr. Fabian met with Halder for a total of ten hours, the trial court noted that Dr. Fabian prepared two reports, dated January 10 and March 10, 2005, respectively, and that he met with Halder for ten hours to prepare for his *first* report. At the request of Halder's counsel, Dr. Fabian spent an additional two hours with Halder on February 26, 2005.

[Halder] ha[d] a sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding."

At Halder's request, the trial court held a second competency hearing on November 10, 2005. This time, Halder called Dr. Jeffrey L. Smalldon, who met with Halder on one occasion for a total of two-and-a-half hours to evaluate his competency.[2] Dr. Smalldon concluded that Halder "[wa]s unable, due to the symptoms of a severe mental illness, namely delusional disorder, combined grandiose and persecutory type, to demonstrate a rational appreciation of the legal proceedings." Dr. Smalldon noted, however, that the symptoms he identified did not prevent Halder from assisting counsel in the preparation of his defense. On this point, Dr. Smalldon testified as follows: "I shouldn't say [that the symptoms] *prevent* [Halder's] ability [to assist in his defense]. [They] *[v]ery seriously compromise* his ability to assist counsel in his own defense." (Emphasis added.)

The State re-called Dr. Bergman to testify. The trial court found her to be more credible than Dr. Smalldon because of the significantly greater amount of time that she had spent interviewing Halder and because "Dr. Bergman spen[t] more time in her practice evaluating patient's [sic] competency than d[id] Dr. Smalldon, who spen[t] most of his time doing evaluations in child custody cases." The court concluded that Halder's mental condition had not changed since its previous decision and determined again that Halder had not proved incompetency to stand trial by a preponderance of the evidence.

---

[2] Dr. Smalldon previously had met with Halder on two occasions, in August 2005, for a total of five to six hours to determine whether he was sane at the time of the shooting incident on May 9, 2003.

### B. Self-Representation Request.

On November 7, 2005, seven days before his trial was to commence, Halder filed a pro se motion to disqualify his second set of lawyers and have a third set appointed.[3] Two days later, on November 9, 2005, the trial court conducted a pretrial hearing at which it considered each of Halder's complaints in turn,[4] determined that they were unfounded, and ultimately overruled them. At that time, the following colloquy ensued:

| | |
|---|---|
| Halder: | As to my motion to disqualify counsel, I mean, you are done with it? |
| Trial Court: | I just ruled on it. Yes, sir. |
| Halder: | In this case, from now onward I want to proceed pro se. |
| Trial Court: | You want to represent yourself pro se? |
| Halder: | Yes. |
| Trial Court: | Would you like to say anything about that, sir? |
| Halder: | Anything about what? |
| Trial Court: | Your reasons. You are making a motion of the Court, an oral motion of the Court to represent yourself? |
| Halder: | Yes. I made myself very clear that my attorneys do not know the background of the case, have done no discovery whatsoever. They have not contacted a single witness, despite the fact that I know numerous people around the world. And they have not done anything. Therefore, I will be much better off having pro se than having these lawyers. |

. . . .

---

[3] Halder had filed a total of "six written and several oral motions to disqualify his [first set of] lawyers." *State v. Halder*, No. 87974, 2007 Ohio App. LEXIS 5258, at *30-31 (Ohio Ct. App. Nov. 8, 2007).

[4] Halder's motion to disqualify raised four complaints about his counsel, none of which are relevant to this appeal.

Trial Court: Mr. Halder, I am not going to rule on this right now, because I would like to look at two cases before I make any decision on this. Because it is a capital case, I want to look at a couple of cases. So we are going to continue. During the break, I will get a couple of the cases. All right?

Halder: One case. Faretta versus California.

Trial Court: Can you spell it?

. . . .

Halder: F A R E T T A. Faretta, 422 U.S. 806, 95 Supreme Court 2575.

Trial Court: I will review that case, also, before I make any decisions. Faretta versus California.

The following day, after reviewing both U.S. Supreme Court and Ohio cases on the issue of pro se representation, the trial court denied Halder's request to represent himself as "untimely" and "merely a tactic for delay." The court observed that Halder "was indicted on this case nearly two and-a-half years ago, and the voir dire with respect to jurors and the jury is due to begin in five days." "Furthermore," the court explained, "the defendant made his pro se motion immediately after the Court denied his written motion to disqualify his current attorneys."

On November 14, 2005, the trial court entered an addendum to the denial of Halder's motion, reiterating its review of *Faretta v. California*, 422 U.S. 806 (1975), and stating that Halder's motion was "untimely, equivocal, and moreover, [wa]s done for the purpose of delay." The court also delineated several specific factual considerations that underlay its decision, the first twelve of which were as follows:

1. [Halder] utilized two teams of appointed counsel for a total of 30 months;

2. [Halder] made six motions to disqualify the first team of lawyers;

3. When the Court granted the Motion to Withdraw Counsel on May 12, 2005, Mr. Halder gave the Court a short list of lawyers (one of which was [his present counsel]), requesting he receive a lawyer from the list;

4. Agreeing to Mr. Halder's specific request, the Court appointed [Halder's present counsel] on May 20, 2005;

5. Mr. Halder ha[d] utilized this second team since that date;

6. Mr. Halder ha[d] appeared in Court with his attorneys on multiple occasions;

7. Mr. Halder ha[d] sought and received 19 continuances;

8. Mr. Halder based his request for self-representation in Court on counsel not getting discovery, not contacting witnesses and not doing anything they are supposed to do;

9. Mr. Halder's request came immediately after the Court denied his Motion to Disqualify . . .;

10. Mr. Halder's motion was not an attempt to disqualify counsel in order to represent himself *pro se*;

11. Mr. Halder requested leave to represent himself only five days before trial was to commence;

12. In Dr. Bergman's report, Mr. Halder explained that he would not consider representing himself because he ha[d] no access to the resources he would need to gather evidence and to prepare the case (internet, phone, fax, addresses, etc.), and he does not have the training to know the rules in court. He observed that he would be no match against the prosecutor at a trial[.]

Halder proceeded to trial, and on December 16, 2005, the jury found him guilty of 3 counts of aggravated murder, 35 counts of capital murder, 14 counts of aggravated burglary, 143 counts of kidnapping, and 1 count of unlawful possession of dangerous ordnance. Although the trial court granted Halder's subsequent motion for acquittal on a terrorism charge and ordered the dismissal of several kidnaping charges, Halder ultimately was sentenced to life imprisonment without parole. He also received consecutive sentences for certain firearm specifications.

**II.**

Halder timely appealed to the Eighth Appellate District of the Ohio Court of Appeals, challenging the trial court's competency and self-representation determinations among others. The state court of appeals overruled all of Halder's assignments of error, affirmed the trial court's judgment, and denied Halder's subsequent motion for reconsideration. Halder sought leave to appeal the denial to the Ohio Supreme Court, which declined review and dismissed Halder's claims "as not involving any substantial constitutional question." Halder's subsequent application for state post-conviction relief was similarly unsuccessful.[5]

On July 22, 2009, Halder filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Northern District of Ohio, raising only the trial court's competency and self-representation determinations as errors. The District Court referred Halder's petition to a federal magistrate judge, who began by concluding that Halder had failed to rebut the correctness of the facts as found by the state court of appeals. Relying on those facts, the magistrate judge recommended that the District Court deny the petition.

Although Halder filed objections to the magistrate judge's report and recommendation, the District Court found the objections limited to the magistrate judge's assessment of the state court rulings. Consequently, the District Court adopted the remainder of the report and recommendation, including its facts, as written; denied Halder's petition; and declined to issue a certificate of appealability (COA). As to Halder's competency claim, the District Court

---

[5] Halder apparently filed an application to re-open his direct appeal in the Ohio Court of Appeals, raising claims of ineffective assistance of appellate counsel that both that court and the Ohio Supreme Court denied, and a separate petition for post-conviction relief in the trial court on January 23, 2007. The State avers that a decision on the petition has not yet been rendered, but a case number search on the trial court's website indicates that the case is closed. In any event, Halder properly has exhausted the claims at issue in his federal habeas petition, *infra*, because they both were fairly presented to the Ohio Court of Appeals and the Ohio Supreme Court. *See Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009).

concluded that Halder "ha[d] failed to show, by clear and convincing evidence, that the state courts' decisions were the result of an unreasonable determination of the facts." Regarding Halder's right to self-representation, the District Court reached three conclusions:

(1)    "Given the fact that this was a capital case with hundreds of charges, any request to permit [Halder] to develop his own defense would inevitably have lead [sic] to a delay in the proceedings";

(2)    The state courts' determination that Halder's "request was untimely and offered merely as a stratagem for delay" was not objectively unreasonable; and

(3)    The state courts' determination that Halder's "request to self-represent was equivocal was neither contrary to nor an unreasonable application of clearly established federal law, nor rested upon an unreasonable determination of the facts."

Halder timely appealed to this court, filed an application for a COA, and moved to proceed *in forma pauperis*. We granted the application and motion and directed the clerk of court to issue a briefing schedule on both of the issues raised in Halder's habeas petition. The petition identified the following issues for review:

1).    Mr. Halder was unconstitutionally denied his right to represent himself. *Faretta v. California*, 422 U.S. 806 (1975), Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

2).    A defendant may not be found competent to stand trial if the defendant has proven by a preponderance of the evidence that the defendant cannot assist in his or her own defense, and no competent evidence has been presented otherwise. *Pate v. Robinson* (1966), 383 U.S. 385; *Drope v. Missouri* (1975), 420 U.S. 162. *Bishop v. United States* (1956), 350 U.S. 961. Fifth and Fourteenth Amendment to U.S. Constitution.

Halder's brief rephrases the issues to ask whether the state courts "unreasonably applied clearly established federal law" or based their decisions "on an unreasonable determination of the facts in light of the evidence presented" when they determined that Halder was competent to stand trial and denied Halder's request to represent himself at trial.

**III.**

AEDPA prohibits federal courts from granting habeas relief

> with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the
> claim . . . was contrary to, or involved an unreasonable
> application of, clearly established Federal law . . . or . . .
> was based on an unreasonable determination of the facts
> in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This court reviews de novo a district court's ultimate denial of habeas relief under AEDPA but generally reviews a district court's findings of fact for clear error. *Awkal v. Mitchell*, 613 F.3d 629, 638 (6th Cir. 2010). Where "the district court did not conduct an evidentiary hearing and relied solely upon the state court record," however, this court reviews its factual findings de novo as well. *Curvan v. Trombley*, 466 F. App'x 475, 478 (6th Cir. 2012) (citing *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). Here, the magistrate judge expressly relied on the opinion of the state court of appeals for its findings of fact, and the District Court expressly accepted those findings as written. Accordingly, we review de novo the District Court's ultimate denial of Halder's petition as well as the findings of fact on which the District Court relied.

**A. Competency.**

The District Court determined, consistent with the report and recommendation, that the question of "[a] defendant's competency is an issue of fact, to which deference must be paid," and concluded that Halder "ha[d] failed to show, by clear and convincing evidence, that the state courts' decisions were the result of an unreasonable determination of the facts." On appeal, Halder acknowledges that the clear and convincing evidence standard is appropriate, citing, like the District Court, this court's decision in *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006).

Halder contends, however, that "there was little reliable, credible evidence that [he] was capable of rationally assisting in his defense." (*Id.*)

In *Filiaggi*, the stun belt used to restrain a defendant misfired as he was being transported to court. 445 F.3d at 853. Afterward, the defendant "was visibly shaken, his back was burned, and he suffered muscle spasms," and so his counsel requested an examination of his competence to stand trial. *Id.* One of the psychiatrists who examined the defendant "stated that it was his 'unequivocal opinion' that [the defendant] was incapable of participating in his own defense 'for at least two days' following the shock," and the defendant submitted affidavits from his attorneys stating that he was "'foaming at the mouth' and often in 'an agitated, catatonic stupor.'" *Id.* at 857. After reviewing the evidence, however, including another mental health expert's determination that "Filiaggi was 'mentally alert' and 'oriented,'" the trial court concluded that the defendant was malingering and proceeded with his trial. This court subsequently determined that the Ohio Supreme Court's conclusion that the defendant was competent during his trial was not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in evidence. *Id.* at 858.

Here, *a fortiori*, not one of the mental health experts who testified at Halder's competency hearings provided an "unequivocal opinion" that Halder was not competent to stand trial. Dr. Eisenberg gave conflicting opinions as to Halder's competency, testifying at the competency hearing that Halder was incompetent although he had last met with Halder more than a year before the hearing and had not personally re-evaluated him.

Although Dr. Fabian opined that Halder suffered from both delusional and personality disorders and concluded that Halder was incapable of rationally assisting his lawyers, he also testified that "the issue of [Halder's] competency is a close call" and observed that "there is some

room for debate among experts about whether [Halder] suffers from both a delusion and a personality disorder." He also was the least experienced of the mental health experts who evaluated Halder.

Finally, Dr. Smalldon, who re-examined Halder's competency to stand trial at Halder's request, concluded that Halder suffered from a delusional disorder that prevented him from demonstrating a rational understanding of the legal proceedings in which he was participating but did *not* prevent Halder from assisting in his defense. This finding is especially significant given that the State contends that Halder failed to preserve any claim that he had no rational understanding of the proceedings against him. Indeed, the District Court expressly noted that Halder did not challenge his rational or factual understanding in his objections to the magistrate judge's report and recommendation. (*See* District Ct. Op., ECF # 23, at PageID # 8136 n.6 ("The record before the Court indicates, and petitioner does not argue otherwise in his objections, that the first part of the *Dusky* [*v. United States*, 362 U.S. 402, 402 (1960) (per curiam)] standard—a rational and factual understanding of the proceedings—was not in dispute.").)[6] Thus, to the extent that only Halder's ability to assist in his defense is at issue, Dr. Smalldon's testimony suggests that Halder's competency claim cannot prevail.

But Halder's failure to preserve a challenge to his rational and factual understanding of the proceedings against him would not prevent this court from considering the challenge on appeal. *See Souter v. Jones*, 395 F.3d 577, 585 (6th Cir. 2005).[7] And even if it did, Halder's

---

[6] Moreover, during Halder's first competency hearing, he agreed with the State that he "[wa]s capable of understanding the nature and objective of the proceedings against him." (Trial Court Competency Ruling, ECF No. 7-1, Ex. 5, PageID # 458 n.1.)

[7] In *Souter*, this Court stated the following:

> We have long held that with regards to a magistrate judge's recommendation, "a party shall file objections with the district court or else waive right to

ability to press his claim that he was not competent to stand trial would not thereby be compromised. Under the Supreme Court's opinion in *Dusky*, a defendant's competency to stand trial depends upon *both* his rational and factual understanding of the proceedings against him *and* his ability to assist his lawyers with his defense. 362 U.S. at 402; *accord Drope v. Missouri*, 420 U.S. 162, 172 (1975). It is thus telling that Dr. Bergman expressly determined that Halder not only understood the nature of the charges against him and the pleas available to him but also that he was capable of meaningfully participating in the prosecutorial process and consulting with his attorneys to develop a defense.

Halder does not dispute that Dr. Bergman was the most experienced of all the mental health experts who testified regarding his competency, nor that she spent the most time examining him. Neither does he assert that, like the defendant in *Filiaggi*, he ever was "in 'an agitated, catatonic stupor,'" 445 F.3d at 857, or otherwise prevented from understanding the proceedings against him or consulting with his attorneys to develop a defense. Accordingly, as the District Court concluded, Halder "has failed to show, by clear and convincing evidence, that the state courts' decisions [regarding his competency to stand trial] were the result of an unreasonable determination of the facts." His competency claim must therefore fail.

### B. Self Representation.

The District Court's conclusions regarding the denial of Halder's right to represent himself differed somewhat from those of the magistrate judge's report and recommendation.

---

appeal." *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). . . .While we have regularly enforced the *Walters* rule, we have also noted that "it plainly is not a jurisdictional rule; the court of appeals retains subject matter jurisdiction over the appeal regardless of the untimely filing or nonfiling of objections." *Kent v. Johnson*, 821 F.2d 1220, 1222 (6th Cir. 1987).

395 F.3d at 585.

The District Court agreed that (1) "[g]iven the fact that this was a capital case with hundreds of charges, any request to permit [Halder] to develop his own defense would inevitably have lead [sic] to a delay in the proceedings"; (2) the state courts' determination that Halder's "request was untimely and offered merely as a stratagem for delay" was not objectively unreasonable; and (3) the state courts' determination that Halder's "request to self-represent was equivocal was neither contrary to nor an unreasonable application of clearly established federal law, nor rested upon an unreasonable determination of the facts." But the District Court declined to adopt the report and recommendation's conclusion that Halder's request for self-representation was made voluntarily and knowingly, finding it unnecessary to reach that issue.

Halder raises two challenges to the denial of his request to represent himself. First, he asserts that the request was timely, contending that he "in no way expressed that he wished for his trial to be delayed" and noting that a defendant's request to proceed pro se generally "is timely if it is done prior to the jury's being selected or sworn." Halder also observes "[that] this Court has indicated that a self-representation request can be timely even if it comes *during* trial, provided that the request is made promptly after the grounds for dissatisfaction with trial counsel arose." (Emphasis in original.) Second, Halder contends that "[his] words were clear" and that the state courts' conclusion that his request to represent himself was equivocal was unreasonable.

As the Supreme Court made clear in *Faretta*, the Sixth Amendment guarantees a criminal defendant the right to "competently and intelligently waive his Constitutional right to assistance of counsel." 422 U.S. at 814 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). But the right is not absolute: the waiver must be timely made. *Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 162 (2000). Further, the waiver is not "to be used as a tactic for delay." *United States v. Frazier-El*, 204 F.3d 553, 560 (4th Cir.

- 15 -

2000). This court has explained that a request to represent oneself is untimely, even "if made prior to the selection and swearing of the jury, . . . when the prosecution makes an affirmative showing that the defendant's request . . . is merely a tactic to secure a delay in the proceeding," *Lewis v. Robinson*, 67 F. App'x 914, 919 (6th Cir. 2003) (quoting *Robards v. Rees*, 789 F.2d 379, 383 (6th Cir. 1986)) (internal quotation marks omitted).

Here, Halder requested that he be allowed to represent himself five days before his trial was scheduled to begin. And in addition to Halder's never previously having requested to proceed pro se and the numerous motions to disqualify counsel that he had filed, a litany of facts informed the state courts' determination that this request was "untimely, equivocal, and…done for the purpose of delay." As the trial court recited, Halder had used two teams of lawyers for a total of thirty months. After discharging his first set of lawyers, he obtained counsel from a short list of lawyers that *he* provided to the trial court. And when he attempted to discharge his second set of lawyers, he did not seek to represent himself, but rather requested the appointment of a third set.

Halder also had sought and received nineteen continuances. And although he moved to represent himself before the jury was selected or sworn, hundreds of charges and the death penalty were at issue in the case against him. In light of this context, which a trial judge must fully consider "to distinguish between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel," *Frazier-El*, 204 F.3d at 560, the state courts' denial of Halder's request to represent himself was not objectively unreasonable. *See also United States v. Mackovich*, 209 F.3d 1227, 1237 (10th Cir. 2000) ("The record in this case . . . . adequately supports the district court's finding that [the defendant] asserted his right to self-representation in an attempt to delay the trial and abuse the judicial process."). The denial of

Halder's request to represent himself, therefore, was not an unreasonable application of clearly established federal law.

**IV.**

Halder is unable to establish by clear and convincing evidence that the state court decisions deeming him competent to stand trial were the result of an unreasonable determination of the facts.  Neither can he establish that the denial of his request to represent himself was an unreasonable application of clearly established federal law.  Accordingly, we AFFIRM the denial of Halder's petition for a writ of habeas corpus.